UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
NETJETS AVIATION, INC., and
NETJETS SALES, INC.,
                    Plaintiffs,

        - against -                        02 Civ. 7441 (DAB)
                                           MEMORANDUM AND ORDER
LHC COMMUNICATIONS LLC, and
LAURENCE S. ZIMMERMAN,

                    Defendants.
--------------------------------------X
DEBORAH A. BATTS, United States District Judge.

     NetJets Aviation and NetJets Sales ("Plaintiffs") now move

this Court for summary judgment on their breach of contract and

account stated claims against LHC Communications LLC ("LHC") and

Laurence Zimmerman ("Zimmerman").  In moving for summary judgment

on the issue of Zimmerman's liability, Plaintiffs argue that he

is liable for LHC's debts because LHC was his alter ego.

     For the reasons contained herein, Plaintiffs' Motion for

Summary Judgment is GRANTED IN PART and DENIED IN PART.  Summary

judgment in favor of Defendants is GRANTED IN PART.


                        I. BACKGROUND

     Plaintiffs NetJets Aviation, Inc. and NetJets Sales, Inc.,

formerly known as Executive Jet Aviation, Inc. and Executive Jet

Sales, Inc. respectively, are Delaware corporations with their

principal places of business in Ohio.  (Compl. ¶¶ 1-2.)

1

Defendant LHC is a limited liability company formed under the
laws of Delaware.  (Pls.' Undisputed Facts at 1; Defs.'
Undisputed Facts at 1.)  LHC leases office space in New York
City.  (See "Lease" at Zimmerman Aff., Ex. B.)  Defendant
Laurence Zimmerman and his wife each were initially 50% owners of
LHC (Balaban Aff. ¶ 3), but later Zimmerman became LHC's sole
investor (Zimmerman Dep. at 24).

A.    The Agreements between the Parties

    On August 1, 1999, LHC entered into an Aircraft Lease
Agreement with NetJets Sales, Inc. (the "Lease Agreement"), under
which LHC promised to pay a $23,683.77 monthly rental fee for use
of NetJets' planes, plus a service charge on any unpaid balances.
(Compl., Ex. A.)  Also on August 1, 1999, LHC entered into an
Aircraft Management Agreement with NetJets Aviation, Inc. (the
"Management Agreement"), under which NetJets would manage LHC's
interest in the Aircraft and provide other services like
inspecting, maintaining, and piloting.  (Compl., Ex. B.)  LHC's
monthly management fee under this Agreement originally was
$15,480, but increased to $16,061 on January 1, 2000.  (Compl.,
Ex. B at 11.)  The Management Agreement also set out hourly
charges: $2,193 for each of the first 100 hours per year that LHC
occupied Plaintiffs' aircraft; $7,710 for the next 25 hours per

2

year; $9,940 for each hour flown above the 125 hours per year. (Compl., Ex. B at 11.)  In his Affidavit, Zimmerman states that Plaintiffs and LHC had modified the Management Agreement to reduce these excess hourly rates.  (Zimmerman Aff. ¶ 11.) Plaintiffs contend that no such modification was ever made (Pls.' Reply Memo at 2; Beach Aff. ¶ 4), and that even were such an oral modification made, it would be invalid because the original Agreement prohibited modifications not in writing (Beach Aff., Ex B at ¶ 21).

Between July 9, 1999 and August 17, 2000, Plaintiffs regularly invoiced LHC for the costs and fees due under these Agreements.  (Beach Aff., ¶ 11, Ex. D.)  Plaintiffs allege that LHC never objected to any of these invoices.  (Beach Aff. ¶ 16.) In fact, when LHC discontinued the Agreements in a July 24, 2000 letter addressed to Plaintiffs from LHC's Chief Financial Officer James Whittier ("Whittier") (Beach Aff., Ex. C.), LHC therein acknowledged its outstanding debt of $440,840.39.  (Id.) Whittier requested that Plaintiffs apply LHC's $100,000 deposit toward that debt (Beach Aff., Ex. C), leaving a balance of $340,840.39.  He also asked Plaintiffs to "contact [LHC's] office to resolve the balance".  (Id.)  Defendants offer nothing to contest the validity of this letter.

B.    <u>Facts Related to Plaintiffs' Alter Ego Theory</u>

The parties also proffer facts related to whether LHC constituted a bona fide business entity, or whether it was merely Zimmerman's alter ego.  Plaintiffs note that Defendants have produced none of LHC's meeting minutes, company by-laws, operating agreements, management agreements, or copies of powers of attorney.  (<u>See</u> Pls.' Mem. Summ. J. ("Pls.' Mem.") at 6.) Plaintiffs also allege that LHC had no independent officers. (<u>Id.</u>)  LHC's Chief Financial Officer James Whittier ("Whittier") attested that his job was to "carry out what Mr. Zimmerman's wishes were"  (Whittier Dep. at 23), including managing and consulting Zimmerman's personal finances (<u>id.</u> at 12).  Whittier also stated that he acted as a chief financial officer for some of Zimmerman's other companies.  (Whittier Dep. at 12, 68, 72, 74.)

Defendants, however, point out that Whittier executed business agreements on behalf of LHC.  (Zimmerman Aff., Exs. E & F.)  Defendants also point out that LHC filed income tax returns for each year between 1999 and 2002 (Balaban Aff., Ex. E), and had as many as seven employees for whom LHC filed W-3 Transmittal of Wage and Tax Statements (Balaban Aff., Ex. A).

In March of 2000, LHC acquired 21,857,143 shares of NuTel Corporation, a telecommunications company to which Bazillion,

4

Inc. ("Bazillion") was a successor.  (Zimmerman Aff., Ex. C.)
According to Zimmerman, Bazillion became LHC's primary
investment.  (Zimmerman Dep. at 19.)  Later in March of 2000, LHC
entered into a Note Participation Agreement whereby LHC agreed to
loan $10,000,000 to Bazillion.  (Zimmerman Aff., Ex. E.)  LHC and
Bazillion raised the amount on the Note Participation Agreement
to $20,000,000 in June of 2000.  (Zimmerman Aff., Ex. F.)

LHC's income tax returns indicate that Zimmerman transferred
$20,000 to LHC in 1999, $13,180,687 in 2000, $616,844 in 2001,
and $374,395 in 2002.  (Balaban Aff. ¶ 4, Ex. E.)  In their
Opposition Memorandum, Defendants now agree with Plaintiffs that
these transfers were contributions by Zimmerman, not loans.
(Pls.' Reply Mem. at 1; Defs.' Mem. Summ. J. ("Defs.' Mem.") at
8-9.)  According to Plaintiffs, LHC could not have survived
without Zimmerman's money transfers, and therefore it was
undercapitalized from its inception.  (Pls.' Mem. at 5.)
Defendants, however, assert that Zimmerman transferred the money
to LHC, not as a gesture to hide LHC's undercapitalization, but
to keep LHC afloat amidst Bazillion's collapse.  (Balaban Aff. ¶
12; and Ex. 4.)  Bazillion became insolvent as early as October
of 2000.  (Zimmerman Dep. II at 6.)

In addition to accepting transfers of money from Zimmerman,
LHC transferred $1,367,080 to Zimmerman's personal account over

the course of several transactions in 2001.  (Barnard Aff., Ex.
C; Balaban Aff., Ex. F.)[1]  These transfers allegedly were made at
a time when, according to Chief Financial Officer James Whittier,
Zimmerman was experiencing trouble with his personal finances.
(Whitter Dep. at 35.)  There also is evidence that Zimmerman
transferred money to LHC from LandTel N.V. — another corporation
in which Zimmerman held a majority ownership interest. (Balaban
Aff. at ¶ 10, Ex. F).

Plaintiffs have moved for summary judgment against
Defendants Zimmerman and LHC on four of the six causes of action.
Of the claims on which Plaintiffs move for summary judgment are:
Plaintiff NetJets Sales' breach of contract claim against LHC and
Zimmerman (Count One); Plaintiff NetJets Aviation's breach of
contract claim against LHC and Zimmerman (Count Two); Plaintiff
NetJets Sales' account stated claim against LHC and Zimmerman
(Count Five); and Plaintiff NetJets Aviation's account stated
claim against LHC and Zimmerman (Count Six).  In their Motion
papers, Plaintiffs do not formally address Plaintiff NetJets
Sales' unjust enrichment claim against LHC and Zimmerman (Count
Three), or Plaintiff NetJets Aviation's unjust enrichment claim

---

[1] Zimmerman also used LHC funds to purchase a Bentley automobile
(Zimmerman Dep. at 68-69), and used the NetJets aircraft at least
six times for pleasure travel (Zimmerman Aff. ¶ 12).

against LHC and Zimmerman (Count Four).  Holding Zimmerman liable
on any of these six counts would require finding that LHC and
Zimmerman are alter egos of each other.


<u>DISCUSSION</u>

A.   <u>Legal Standard for Summary Judgment</u>

A district court should grant summary judgment when there is
"no genuine issue as to any material fact," and the moving party
is entitled to judgment as a matter of law.  Fed. R. Civ. P.
56(c); <u>see also</u> <u>Hermes Int'l v. Lederer de Paris Fifth Ave.,
Inc.</u>, 219 F.3d 104, 107 (2d Cir. 2000).  Genuine issues of
material fact cannot be created by mere conclusory allegations;
summary judgment is appropriate only when, "after drawing all
reasonable inferences in favor of a non-movant, no reasonable
trier of fact could find in favor of that party."  <u>Heublein v.
United States</u>, 996 F.2d 1455, 1461 (2d Cir. 1993) (<u>citing
Matsushita Elec. Industr. Co. v. Zenith Radio Corp.</u>, 475 U.S.
574, 587-88, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

In assessing when summary judgment should be granted, "there
must be more than a 'scintilla of evidence' in the non-movant's
favor; there must be evidence upon which a fact-finder could
reasonably find for the non-movant."  <u>Id.</u> (<u>citing Anderson v.
Liberty Lobby, Inc.</u>, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L.

Ed. 2d 202 (1986)).  While a court must always "resolv[e]
ambiguities and draw[ ] reasonable inferences against the moving
party," Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir.
1986) (citing Anderson), the non-movant may not rely upon "mere
speculation or conjecture as to the true nature of the facts to
overcome a motion for summary judgment."  Id. at 12.  Instead,
when the moving party has documented particular facts in the
record, "the opposing party must 'set forth specific facts
showing that there is a genuine issue for trial.'"  Williams v.
Smith, 781 F.2d 319, 323 (2d Cir. 1986) (quoting Fed. R. Civ. P.
56(e)).  Establishing such facts requires going beyond the
allegations of the pleadings, as the moment has arrived "'to put
up or shut up.'"  Weinstock v. Columbia Univ., 224 F.3d 33, 41
(2d Cir. 2000) (citation omitted).  Unsupported allegations in
the pleadings thus cannot create a material issue of fact.  Id.


B.    Alter Ego Theory of Liability

     Plaintiffs seek to hold Zimmerman liable for LHC's wrongs.
Courts interchangeably refer to the alter ego theory as "piercing
the corporate veil."  SR International Business Ins. Co., Ltd. v.
World Trade Center Properties, LLC, 375 F. Supp. 2d 238, 243
(S.D.N.Y. 2005); Acciai Speciali Terni USA, Inc. v. Momene, 202
F. Supp. 2d 203, 207-08 (S.D.N.Y. 2002); Sonnenblick-Goldman Co.

8

v. ITT Corp., 912 F. Supp. 85, 88-89 (S.D.N.Y. 1996).  See Mobil
Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 266 (D. Del.
1989) (delineating the varied terms used by courts to refer to
the "alter ego theory", including "disregarding the corporate
entity" and "piercing the corporate veil").

       Piercing the corporate veil is a state law claim.  Under New
York choice of law principles, "[t]he law of the state of
incorporation determines when the corporate form" will be
pierced.  Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir.
1995) (quoting Fletcher v. Atex, Inc., 861 F. Supp. 242, 244
(S.D.N.Y. 1991) (quoting Kalb, Voorhis & Co. v. American Fin.
Corp., 8 F.3d 130, 132 (2d Cir. 1993))).  LHC is a Delaware
limited liability company.  (Compl. ¶ 3.)  Hence, Delaware law
controls.[2]

       Under Delaware law, piercing the corporate veil is permitted
"where [the business entity] is in fact a mere instrumentality or
alter ego of its owner."  Fletcher, 68 F.3d at 1457 (quoting
Geyer v. Ingersoll Publications Co., 621 A.2d 784, 793 (Del. Ch.
1992)).  "A plaintiff seeking to persuade a Delaware court to
disregard the corporate structure faces 'a difficult task.'"
Fletcher, 68 F.3d at 1458 (quoting Harco, 1989 WL 110537 at *4.)

_____

[2] The parties agree that Delaware law controls this issue.  (P's
Mem. Summ. J. at 17; D. Mem. Summ. J. at 7.)

9

Under the alter ego theory, Plaintiffs must show (1) that the business entity and its owner "operated as a single economic entity" and (2) that an "overall element of injustice or unfairness . . . [is] present." <u>Id.</u> (quoting <u>Harper v. Delaware Valley Broadcasters, Inc.</u>, 743 F. Supp. 1076, 1085 (D. Del. 1990), <u>aff'd</u> 932 F.2d 959 (3d Cir. 1991)).

    (1)  <u>Operation as a Single Economic Unit</u>

To determine whether a business entity and its owner are a "single economic unit", several factors are to be considered, including:

> [W]hether the corporation was adequately capitalized for the business undertaking; whether the business entity was solvent; whether dividends were paid, business records kept, officers and directors functioned properly, and other business formalities were observed; whether the owner siphoned business funds; and whether, in general, the business entity simply functioned as a facade for the dominant shareholder.

<u>Harco Nat'l Ins. Co. v. Green Farm, Inc.</u>, 1989 WL 110537, at *5 (Del. Ch. 1989) (quoting <u>United States v. Golden Acres, Inc.</u>, 702 F. Supp. 1097, 1104 (D. Del. 1988)).

Plaintiffs contend that LHC and Zimmerman functioned as a single economic unit because Zimmerman siphoned funds from LHC. (Zimmerman Dep. at 41-47.)  According to LHC's Chief Financial Officer James Whittier, Zimmerman shifted money from LHC's

10

account to his own: "Money was put in and taken out as needed."
(Whittier Dep. at 62.)  Whittier suggests that Zimmerman did so
to recoup his personal margin debt: "Monies would go in and out
of LHC based on the need.  So if you're asking could there or was
there a time when possibly money was repatriated back to Mr.
Zimmerman to meet a margin call, the answer is yes."  (<u>Id.</u>)  (<u>See</u>
<u>also</u> Barnard Aff. at ¶ 9, Ex. G (indicating that Zimmerman
frequently transferred LHC funds to his personal account when his
personal account fell below zero).)  According to LHC's checking
account register, Zimmerman also transferred funds between the
two accounts during the time when Bazillion, LHC's main
investment, closed its doors.  (Balaban Aff. at ¶ 5, Ex. C.)
Zimmerman concedes that he booked numerous flights on Plaintiffs'
jets for family travel, though he characterizes some of these
trips as business-related.  Transactions recorded on LHC's books
indicate that Zimmerman transferred funds between LHC and his
other companies (Pl.'s Mem. Summ. J. at 9), including Fox Lair
Holdings (Barnard Aff., Ex. C at 21, 25-28, 31), Landover Telecom
(Barnard Aff., Ex. C at 1, 6, 7, 9, 14, 17, 20, 27, 31), and
KimLar Consulting (Barnard Aff., Ex. C at 1, 9, 15, 18, 27, 32).
According to Whittier:

> Funds were needed by LHC and Mr. Zimmerman was
> supplying the funds.  Mr. Zimmerman owned 100
> percent of Landover Telecom so it is possible he

11

> could take funds from his personal account and it
> is possible he cold take funds from another
> corporate account which he owns 100 percent of so
> it is possible that Landover Telecom could have
> made an investment into LHC.

(Whittier Dep. at 69:3 - 69:11.)  Whittier also attested that "If

LHC needed funds and there were liquid funds in KimLar Consulting

that were easily transferable over to LHC to satisfy the capital

requirement, we would transfer the funds from KimLar."  (<u>Id.</u> at

73:15 - 73:18.)

Siphoning of funds alone does not signify that a company and

its owner function as a single unit.  Plaintiffs also allege that

Defendants produced no by-laws, meeting minutes, or other

corporate indicia during discovery.  (Pl.'s Mem. Summ. J. at 5-

6.)  Defendants assert that LHC rented its own operational

facility (<u>see</u> Lease at Zimmerman Aff., Ex. B), but such a rental

agreement does not indicate a separateness between LHC and

Zimmerman since Whittier stated that the facility was where he

and "Mr. Zimmerman . . . were located when the company was

formed" (Whittier Dep. at 18).  Whittier referred to Zimmerman

and LHC interchangeably when describing who was housed in LHC's

facility.

> Q    Was there a time that the business address of LHC
>      Communications was changed to 600 Madison?
> A    Yes.
> Q    Why was the business address changed?

12

> A      Laurence moved into permanent office space and 156 was
>         temporary space.

(Whittier Dep. at 19.)

Although LHC maintained payroll and tax records for seven of
its employees (Balaban Aff. ¶ 2, Ex. A), how many of these
employees actually worked for Zimmerman's personal needs is
unclear (See Whittier Dep. at 24 ("[One of LHC's employees]
assisted . . . in day-to-day responsibilities with regards to Mr.
Zimmerman.")).  And while LHC formed written agreements with
other businesses, these businesses were dominated by Zimmerman.
(Zimmerman Dep., Ex. D.)

Whittier did not make financial decisions without first
confirming them with Zimmerman.  (Pl.'s Mem. Summ. J. at 5;
Whittier Dep. at 22.)  Whittier testified that his role in each
of Zimmerman's companies was the same.  For example:

> Q      Did you have any role in IP II Partners?
>
> A      There we go.  Acting chief financial officer.
>
> Q      And your responsibilities?
>
> A      Same as in all the other corporations that I
>        performed.  There was very little activity.
>        Money was raised.  When it was raised, it was
>        forwarded to Bazillion for which stock was
>        received for ownership.  There was very little
>        activity.

(Whittier Dep. at 74:22 - 75:6.)

13

For these reasons, Plaintiffs have shown that Zimmerman and LHC functioned as a single economic unit.

### (2)   Overall Element of Injustice or Unfairness

However, Plaintiffs fall short of their burden under the second prong of the corporate veil analysis.  Delaware law requires that an "overall element of injustice or unfairness [be] present" before piercing a corporate veil.  Harper, 743 F. Supp. at 1085.  Whether "an overall element of injustice or unfairness" exists hinges on the defendant's "use of the corporate form", and "may include factors such as contravention of law or contract, public wrong, or . . . equitable consideration[s]."  SR International, 375 F. Supp. 2d 238, 243-44 (S.D.N.Y. 2005) (quoting Mobil Oil Corp., 718 F. Supp. 260, 268-69 (D. Del. 1989).  The underlying cause of action in a case does not supply the necessary injustice or unfairness.  Mobil Oil, 718 F. Supp. at 268-69.

While the Delaware courts occasionally state that something other than specific fraudulent intent could satisfy the second prong, wherever the courts have given shape to the second prong, they primarily have focused on the need to show fraud or bad faith.  The Mobil Oil court, for example, cited numerous cases requiring fraudulent intent.  Among the cases cited by that court

14

were Operating Engineers Pension Trust v. Reed, 726 F.2d 513, 515
(9th Cir. 1984) (one of the elements for piercing the corporate
veil is that there be a "fraudulent intent behind the
incorporation"); Luckett v. Bethlehem Steel Corp., 618 F.2d 1373,
1379 (10th Cir. 1980) ("[a] court will disregard the corporate
entity where fraud or illegal or inequitable conduct is the
result of the use of the corporate structures"); Seymour v. Hull
& Moreland Eng'g, 605 F.2d 1105, 1113 (9th Cir. 1979) (in
affirming the trial court's decision not to pierce the corporate
veil, the Ninth Circuit observed that "[w]hile there was a
substantial amount of evidence from which the bad faith of [the
defendant shareholders] might be inferred in disregarding their
obligations to the [plaintiffs], no evidence of bad faith or
fraudulent intent in forming the corporation was presented")
(footnote omitted).

        Plaintiffs argue that injustice has occurred because LHC has
not paid them in accordance with their Agreements (Pls.' Mem. of
Law at 19), but this allegation relates to Plaintiffs' underlying
cause of action, and therefore does not suffice.  Plaintiffs
further argue that the element of injustice is present because
"Mr. Zimmerman allowed LHC to default on its payments to NetJets
even as he was siphoning money from the company coffers,
transferring funds to other companies he controlled, and making

payments through LHC on a mortgage and luxury cars that were in
his own name."  (Pls.' Mem. of Law at 19.)  But each of these
actions are factors in considering the first prong of the alter
ego analysis and cannot simultaneously be used by Plaintiffs to
satisfy the second prong.  "To hold otherwise would render the
fraud or injustice element meaningless and would sanction
bootstrapping."  Mobil Oil, 718 F. Supp. at 268.

Even though Plaintiffs have introduced evidence that
Zimmerman moved LHC funds to his personal account, they have not
proven as a matter of law that Zimmerman conducted a
sophisticated shell game to the purposeful detriment of
creditors, namely NetJets.  Cf. Minnesota Mining & Mfg. Co. v.
Eco Chem, Inc., 757 F.2d 1256 (Fed. Cir. 1985) (cited in Mobil
Oil, 718 F. Supp. at 269-70) (finding an overall element of
injustice when the shareholder defendants purposely manipulated
the infringing corporation so as to thwart plaintiff's recovery
of its judgment).  Nor have Plaintiffs set forth any facts from
which a jury could reasonably conclude that Zimmerman formed LHC
with the specific fraudulent intent of evading liability to
Plaintiffs.  To the contrary, LHC was formed in 1998 (Balaban
Aff. ¶ 2), but LHC did not enter into its Agreements with
Plaintiffs until August 1, 1999 (Compl., Exs. A & B).  Because
the second prong does not permit a court to dismantle the

technical legal barriers between corporate entities acting as a single economic unit unless those barriers were erected with the specific intent of defrauding creditors or avoiding an adverse judgment, see Mobil Oil, 718 F. Supp. at 269, citing 1 Fletcher § 41.10, at 157 (cum. supp. 1988), or unless an injustice independent of the underlying claim has occurred, any corporate veil that may exist between Zimmerman and LHC as a matter of law cannot be pierced.

Accordingly, Plaintiffs' Motion for Summary Judgment on the alter ego theory is hereby DENIED.  Summary judgment on the alter ego theory is GRANTED in favor of Defendant Zimmerman sua sponte.[3]  Therefore, Defendant Zimmerman shall not be held liable

_____

[3] It has long been the law of this Circuit that "as long as some party has made a motion for summary judgment, a court may grant summary judgment to a non-moving party, provided that party has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried." First Financial Ins. Co. v. AllState Interior Demolition Corp., 193 F.3d 109, 115 (2d Cir. 1999); see also Coach Leatherware Co. v. AnnTaylor, Inc., 933 F.2d 162, 167 (2d Cir. 1991) (noting that a district court's sua sponte granting of summary judgment in favor of a non-moving party is "an accepted method of expediting litigation," as long as "the facts before the district court were fully developed so that the moving party suffered no procedural prejudice"); Lowenschuss v. Kane, 520 F.2d 255, 261 (2d Cir. 1975) ("We have sanctioned a sua sponte award by the court of summary judgment to a non-moving party where it appeared from the papers, affidavits and other proofs submitted by the parties that there were no disputed issues of material fact and that judgment for the non-moving party would be appropriate as a matter of law.").

Plaintiffs, who moved for summary judgment on the alter ego

for any of LHC's misconduct alleged in this case.  Summary

judgment is hereby entered in favor of Defendant Zimmerman on all

claims against him, namely, Plaintiffs' claims under breach of

contract, account stated, and unjust enrichment.  The only claims

now remaining are Plaintiffs' claims against LHC.


C.   <u>Account Stated Claims Against LHC</u>

     Plaintiffs have moved for summary judgment on their account

stated claims.

> Under federal and New York law, an account stated
> refers to a promise by a debtor to pay a stated
> sum of money which the parties had agreed upon as
> the amount due . . . . The promise may be either
> express or implied but it must be founded on
> previous transactions creating the relationship of
> debtor and creditor.

<u>The Orb Factory, Ltd. v. Design Science Toys, Ltd.</u>, 1999 WL

191527, at *17 (S.D.N.Y. 1999) (internal quotations and citations

omitted).  "An account stated may be implied if the party

receiving the statement keeps it for a reasonable time without

objecting to or questioning the correctness of the account."  <u>In</u>

_____

theory, have had a full and fair opportunity to establish their
case and have provided no "indication that [they] might otherwise
bring forward evidence that would affect the court's summary
judgment determination."  <u>Coach Leatherware</u>, 933 F.2d at 167.  As
the Court has before it all the facts necessary to find for
Defendant Zimmerman, the Court may grant summary judgment in his
favor on the alter ego theory <u>sua sponte</u>.

re Rockefeller Ctr. Properties, 2002 WL 22051, at *4 (S.D.N.Y. 2002) (citing Orb, 199 WL 191527, at *17).  A debtor who makes a partial payment toward reducing the balance on an account gives rise to an account stated claim.  Rockefeller, 2002 WL 22051, at *17 (citing Orb, 1999 WL 191527, at *17; Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff, 638 F. Supp. 714, 720 (S.D.N.Y. 1986); and Chisolm-Ryder Co. v. Sommer & Sommer, 421 N.Y.S.2d 455, 457 (4th Dept. 1979)).

LHC's Chief Financial Officer not only failed to object to or question the correctness of the $440,840.39 balance on their account with Plaintiffs, but he also acknowledged the accuracy of that balance and authorized a partial payment on it in the amount of $100,000.00.  (Letter from J. Whittier to R. Miller, dated Jul. 24, 2000 in Beach Aff., Ex. C.)  LHC therein promised to pay Plaintiffs the remaining $340,840.39 on the account.

To contest the account stated claim, LHC points to Zimmerman's averments that the parties had agreed to reduce the hourly rate in the Management Agreement, but that Plaintiffs later recanted this alteration.  (Zimmerman Aff. ¶ 11.)  However, this alleged oral alteration is inapposite to account stated

19

liability, since a claim for account stated is independent of the underlying agreement or alterations thereto.[4]

Accordingly, Plaintiffs' Motion for Summary Judgment on their account stated claims against LHC is hereby GRANTED.

## C.   Breach of Contract and Unjust Enrichment Claims Against LHC

Plaintiffs also move for summary judgment on their breach of contract claims.  Because this Court has granted Plaintiffs' summary judgment motion on their account stated claims against LHC, their claims for alternative relief under a breach of contract theory do not survive.  Cf. Lankler Siffert & Wohl, LLP v. Rossi, 2004 WL 541842, at * (S.D.N.Y. 2004) (finding that once judgment is certified against defendant on plaintiff's account stated claim, plaintiff's claim for alternate relief under a

_____

[4] Even were such an alteration to the Management Agreement germane, Zimmerman's conclusory statements that the parties agreed to the alterations are not sufficient to avoid summary judgment.  See Levisohn, Lerner, Berger & Langsam v. Gottlieb, 309 A.D.2d 668, 668 (N.Y. 1st Dept. 2003) (defendant's allegations of oral protests to an account stated are insufficient because they fail to identify the persons with whom he spoke or to specify the substance of the alleged conversations); Fink, Weinberger, Fredman, Berman & Lowell v. Petrides, 80 A.D.2d 781 (N.Y. 1st Dept. 1981) (granting summary judgment to plaintiff on account stated claim because "[defendant's] affidavits are purely conclusory and do not set forth such necessary evidentiary details as when, where or by whom the alleged oral agreement [to amend the balance due] was made . . .").

breach of contract theory would be precluded).  Plaintiffs'
claims for breach of contract against LHC are hereby DISMISSED
WITH PREJUDICE.

Plaintiffs' do not address their unjust enrichment claims in
their Motion.  But even had they done so, that motion would not
have succeeded.  See Daewoo International (America) Corp.
Creditor Trust v. SSTS America Corp., 2004 WL 830079, at *7
(S.D.N.Y. 2004) (granting summary judgment on unjust enrichment
claim to defendant who breached contract when existence of
underlying contract is not in dispute).  Because the existence of
the underlying contract is not at issue in this case, Plaintiffs'
unjust enrichment claims against LHC are hereby DISMISSED WITH
PREJUDICE.


CONCLUSION

Summary judgment is GRANTED in favor of Plaintiffs on their
account stated claims against LHC.  As to Plaintiffs' account
stated claims against Zimmerman, summary judgment is GRANTED in
Zimmerman's favor.

Plaintiffs' breach of contract claims and unjust enrichment
claims against LHC and Zimmerman are DISMISSED WITH PREJUDICE.

The Clerk of Court is directed to close the docket in this case.

SO ORDERED.

Dated:      New York, New York
            June 12, 2006

                                    Deborah A. Batts
                              United Stated District Judge